IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEVE BLAKENEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: |
| | ) | |
| CITY OF PINE LAWN, | ) | |
| SYLVESTER CALDWELL, | ) | |
| BRIAN KRUEGER, | ) | |
| DONNELL SMITH, | ) | |
| WILLIE EPPS, | ) | |
| CLARENCE HARMON, | ) | |
| LASHAWN COLQUITT, | ) | |
| ANTHONY GRAY, | ) | |
| PAUL RINCK, | ) | |
| JOHN STRUCKHOFF, | ) | |
| MISSOURI PUBLIC ENTITY RISK | ) | |
| MANAGEMENT FUND (MOPERM), and | ) | |
| SMITH & ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PETITION**

**I.      Jurisdiction and Venue**

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 over Plaintiff's

cause of actions under 42 U.S.C. §§1981 and 1983 due to violations of the Constitution of the

United States, including the First and Fourteenth Amendments, U.S. Const. Amend. I and XIV,

and 5 U.S.C. §552 a(b).  The Court has supplemental jurisdiction over Plaintiff's causes of action

under Missouri law pursuant to 28 U.S.C. §1367.

2.      This Court has personal jurisdiction over Defendants, who are located within, or

residents of, the Eastern District of Missouri.

3.     The Defendants are subject to personal jurisdiction within the Eastern District of Missouri and the events that give rise to this action occurred within the Eastern District of Missouri and, pursuant to 28 U.S.C. §1391, the Eastern District of Missouri is the proper venue.

## II.     Parties

4.     Plaintiff, Steven Blakeney (hereinafter referred to as "Blakeney"), is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri.

5.     Defendant, City of Pine lawn, is a municipality and public entity located within the U.S. District Court for the Eastern District of Missouri.  The City of Pine Lawn is Blakeney's former employer.

6.     Defendant, Sylvester Caldwell, (hereinafter referred to as "Caldwell") is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri.  Caldwell was the mayor of the City of Pine Lawn during part of Blakeney's employment with the City of Pine Lawn.  Caldwell is sued in his official capacity as Mayor of the City of Pine Lawn, and in his individual unofficial capacity.

7.     Defendant, Brian Krueger (hereinafter referred to as "Krueger"), is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri.  Krueger was an employee with the City of Pine Lawn during the time period that Blakeney worked for the City of Pine Lawn.  Krueger's job title was City Administrator.  Krueger is sued in his official capacity of City Administrator for the City of Pine Lawn, and in his individual unofficial capacity.

8.     Defendant, Donnell Smith, (hereinafter referred to as "Smith") is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri.  Smith was the City Attorney for the City of Pine Lawn during part of Blakeney's employment with the City of Pine

Lawn. Smith is sued in his official capacity as City Attorney for the City of Pine Lawn and in his individual unofficial capacity.

9.     Defendant Willie Epps (Hereafter "Epps") is a U.S. citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Epps is sued in his official capacity as a City of Pine Lawn police officer and in his individual unofficial capacity

10.     Defendant Clarence Harmon (Hereafter "Harmon") is a U.S. citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Harmon is sued in his official capacity as a City of Pine Lawn police officer and in his individual unofficial capacity

11.     Defendant Lashawn Colquitt (hereafter Colquitt) is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Colquitt is sued in her official capacity as assistant Pine Lawn City Administrator and in her individual unofficial capacity

12.     Defendant Anthony Gray (hereafter "Gray") is a U.S. Citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Gray is sued in his official capacities as Public Safety Director, and City Prosecutor for the City of Pine Lawn and in his individual unofficial capacity.

13.     Defendant Paul Rinck (hereafter "Rinck") is a U.S. citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Rinck is sued in his official capacity as a City of Pine Lawn police officer and in his individual unofficial capacity

14.     Defendant John Struckhoff (hereafter "Struckhoff") is a U.S. citizen and a resident within the U.S. District Court for the Eastern District of Missouri. Struckhoff is sued in his official capacity as a City of Pine Lawn police officer and in his individual unofficial capacity.

15.     Defendant Missouri Public Entity Risk Management Fund (hereinafter referred to as "MOPERM") is a statutorily-created risk management fund offering coverage to public entities

in Missouri. At all times relevant herein, MOPERM provided liability coverage to the City of Pine Lawn. MOPERM is headquartered in Jefferson City, Missouri and has numerous contracted agencies which reside within the U.S. District Court for the Eastern District of Missouri.

**III.     Facts Common to All Counts**

**A.     Plaintiff's Employment with Pine Lawn.**

16.     Blakeney became a certified law enforcement officer by the State of Missouri in 2010.

17.     Blakeney was hired in April 2010 as a probationary policeman by the City of Pine Lawn ("Pine Lawn"), a municipality, upon completion of a full background check, performed by the Chief of Police, Ricky Collins, and after receipt of Blakeney's background file from the Missouri Department of Public Safety.  The City Prosecutor who eventually also held the title of Pine Lawn Director of Public Safety ("Director"), Anthony Gray ("Gray") was one of the Pine Lawn officials that interviewed Blakeney for the Pine Lawn police department job and he discussed Blakeney's entire background with Blakeney.

18.     During his tenure with the City of Pine Lawn, Blakeney was an exemplary police officer who was rapidly promoted and routinely awarded for his exceptional service, to wit:

    a.     After Blakeney was hired by the Pine Lawn police department, Blakeney was awarded the Medal of Valor in 2010 for his police work.

    b.     Blakeney received the Distinguished Service Medal for his work for the Pine Lawn police department in 2011. Blakeney received the Chief's letter of Commendation while working for the Pine Lawn police department in 2011.

    c.     Blakeney was promoted to the rank of Corporal in 2011.

    d.     Blakeney was promoted to Sergeant in 2012.

Page **4** of **247**

e.      Blakeney was appointed by Board of Aldermen the responsibilities of Commander of Operations and Criminal Investigations in 2012 for the Pine Lawn police department.

f.      In July 2013, Blakeney was presented with the Chief's letter of Commendation in Creve Coeur, Missouri for his police work.

g.      Blakeney received the Sheriff's letter of appreciation in Jefferson County, Missouri in October 2013 for his police work.

h.      Blakeney received certifications for attendance and completion of numerous training classes to support his position as commander.  Copies of the awards and/or honors and certifications are attached as **Exhibit 1.**

i.      In May 2013, Blakeney received the letter of commendation from the Mayor of Pine Lawn.  Mayor Sylvester Caldwell ("Caldwell") forwarded his letter of commendation for Blakeney's exceptional police work to the Attorney General's Office and the Missouri Department of Public Safety.    A copy of the Mayor's letter of commendation is attached as **Exhibit 2.**

j.      The Missouri State Investigator Association awarded Blakeney "Investigator of the Year" for 2013-2014.  The award was given to a single police officer in the State of Missouri.  Blakeney was presented this honor at a conference awards dinner in May 2014.  His investigations included clearing approximately half dozen burglaries committed by a serial burglar.  Blakeney obtained a confession from a registered sexual offender that had committed a rape on a juvenile. Blakeney secured an arrest on a shooting suspect that shot a juvenile in the leg after an un-provoked attack.  Blakeney, after conducting controlled buys of drugs, secured search warrants on two houses, resulting in

numerous arrests and a seizure of weapons and illegal drugs. Blakeney also conducted an investigation that uncovered corruption in a neighboring jurisdiction police department. The investigation resulted in two police officers being arrested by the Federal Bureau of Investigation for conspiracy to distribute drugs. After working on an investigation of a suicide by a local star athlete, Blakeney determined that a possible motive may have been bullying. Two separate felony arrests were made as a result of Blakeney's investigation. Blakeney also located suspects from other jurisdictions wanted for homicides and first-degree assaults. Additionally, Blakeney located material witnesses for the circuit attorney's office. A copy of the Missouri State Investigator Association "Investigator of The Year" award is attached as **Exhibit 3**.

k.     Blakeney was promoted to Lieutenant in May 2014, and he became the Deputy Chief in charge of the Pine Lawn police department day-to-day operations (approximately 3 months before the Mayor was indicted and 6-7 months prior to Pine Lawn removing Blakeney from his duties).

l.     At the time of Blakeney's last promotion, he had not had any written employment disciplinary actions while working for Pine Lawn.

m.     Blakeney was the most decorated and trained police officer in the Pine Lawn Police Department during the time period that the City of Pine Lawn employed Blakeney.

n.     Under Blakeney's command, the crime rate in Pine Lawn dropped because of Blakeney's "zero tolerance" policy, described by Director Gray as Blakeney's "philosophy" of "zero tolerance", and "no discretion, by the book, period". Director Gray described Blakeney as "a no-nonsense kind of guy when it came down to the streets."

**B.    Blakeney Blows the Whistle on Several City of Pine Lawn Officials.**

19.    Pine Lawn policies and regulations approved by the Board of Alderman provided protections for whistleblowers, including protections for police officers who investigate illegal conduct in the government.

20.    Blakeney discovered, investigated and reported rampant illegal activity within the City of Pine Lawn government.

21.    Investigators with the Federal Bureau of Investigation ("FBI") approached Blakeney in the late summer of 2013 and requested information regarding illegal activities by government officials working for Pine Lawn.

22.    During 2013 and 2014, Blakeney supplied pertinent information to the FBI regarding corruption by officials working for Pine Lawn.

23.    In addition, Pine Lawn Board of Aldermen officials requested and received information from Blakeney regarding other Pine Lawn officials that the Aldermen suspected to be involved in criminal activity.

24.    Blakeney also reported several suspected illegal activities to the Missouri State Police.

25.    Blakeney's cooperation with the FBI, and the suspecting Pine Lawn officials, provided them with information that likely contributed to Mayor Caldwell's, arrest, indictment, and eventual criminal conviction and 33-month prison sentence for extortion.

26.    The information provided by Blakeney also led to the termination and arrest of the then-Pine Lawn City Administrator, Brian Krueger ("Krueger"), for misappropriating City funds through a fraudulent bank account.

27.     The information Blakeney provided also led to the removal of Municipal Attorney

Anthony Gray as the Pine Lawn Director of Public Safety.

**Blakeney discovered and reported suspected illegal activity of Mayor Caldwell**

28.     Blakeney's information provided to the FBI (and Aldermen) included, but was not

limited to, the following:

a. Blakeney provided information possibly leading to the identification of key witnesses in an alleged extortion scheme(s) involving Mayor Caldwell.  (Caldwell was indicted and pled guilty to this crime(s)).

b. Mayor Caldwell had his driveway paved and porch repaired at the same time that Pine Lawn paid to repave the road in front of Mayor Caldwell's house.  There were approximately 65 other houses along the street that did not get their driveways and/or porches repaved at that time by that contractor.  In addition, for the two days that the cement dried in the driveway of Mayor Caldwell's house, Caldwell required Pine Lawn police officers to sit in their squad car in front of his house so that nobody would walk through the cement while it dried.

c. Mayor Caldwell had people summoned to court by police officers after he observed some alleged minor violation that they committed.  Many of these people were consistently the same individuals and he referenced them as the "bitter bunch".  Many of the people were believed to be past political adversaries or citizens that publicly criticized him.  Mayor Caldwell frequently called for the arrest and summons of citizens on the police radio before switching to a new dispatch service.  After switching radio dispatch services, he was prohibited from utilizing the police radio but still called Pine Lawn officers when he wanted to have someone arrested via cellular telephone.

d. Mayor Caldwell ordered video and still footage of political adversaries who were arrested, by an outside vendor.  Mayor Caldwell used the photos in a later campaign ad with the "Pine Lawn Evening World".  The Ad/Article in the paper discredited past and future political candidates pictured in various states of arrest.  Some were leg shackled for the photos.

e. Mayor Caldwell requested, through City Prosecutor Gray, an arrest warrant during the time period of his last election to arrest the opposing candidate on a minor offense that would normally require only a ticket.  Caldwell was Police "Commissioner" by City Ordinance and was the Administrative head of the Pine Lawn Police Department.

f. Mayor Caldwell would secure the release from jail or dismiss charges against certain individuals who were believed to be known supporters of Mayor Caldwell.

g. On one particular occasion, Mayor Caldwell obtained the release of an individual from the jail. The Mayor then gave beer(s) to the individual who was released because it was past the time that individual could obtain liquor from a store.

h. Mayor Caldwell, on several occasions, had on-duty police officers stationed overnight in their squad cars to watch his D.J. equipment when he left it in the city community center and during other events. The officers were stationed at both entrances to make sure that his personal equipment was not stolen during a burglary.

i. Mayor Caldwell had police officers act as personal security outside of the Pine Lawn jurisdiction while on duty, while he was working at private events (non-city business) at the Ambassador in North County and in other venues.

j. Mayor Caldwell used a city public works van to transport his personal D.J. equipment to private events for non-city business.

k. Mayor Caldwell visited various markets and shops located in Pine Lawn. The Mayor removed items but did not pay for them stating that they would be added to his tab.

l. Mayor Caldwell required Pine Lawn employees to pump gasoline in his vehicle at gas stations, so he wouldn't have to get out of his vehicle.

m. Mayor Caldwell required Blakeney to buy the Mayor's lunch or dinner on pay day on many occasions. Blakeney was requested to get a Boss's Day gift every year and he had to supply two large bottles of cool water cologne on Mayor Caldwell's birthday and Father's Day each year. Blakeney had to supply a box of pizzas from a family friend's business each month.

n. Mayor Caldwell ordered other officers to stop and frisk people for positive confirmation of their identity if they were within a certain range of his house in Pine Lawn, such as a cable repairman. For example, Mayor Caldwell had officers call the 1-800 numbers on the cable repairmen I.D. badges to confirm that they were cable company employees. Blakeney reported this to Mayor Caldwell as unlawful stops and unlawful detention during the stops, but it never ceased. Blakeney was reprimanded by Caldwell after advising him stops were unlawful.

o. Mayor Caldwell ordered vehicles towed under any circumstances of arrest, even if the vehicle was safely and legally parked and the arrested owners consented to leaving the car parked on the street. Mayor Caldwell evaluated police officers' performance based on the number of vehicles they towed during their shift and at DUI checkpoints.

p. Mayor Caldwell mandated that each police officer write at least 80-100 tickets per month rendering totals of up to 1800-1900 summons/tickets during some months. The Mayor personally reviewed these numbers in a report prepared for him monthly and stated that they were needed to pay the "office salaries", including the Mayor's salary. Mayor Caldwell's salary was increased to $60,000 as a full-time job after he was just elected to

office, plus he was given Health Insurance, free gasoline, a city credit card, a cellular phone, and use of three city cars for private non-city business.

q. There were part-time Pine Lawn employees called the "neighborhood watch", positions created by Caldwell, whose real job was to only watch Mayor Caldwell's house 24 hours per day after a brick was thrown through his window during his last election. The "neighborhood watch" cost the city ninety thousand dollars until it was ceased for budgetary reasons because of the immediate elimination of speed cameras.

r. Mayor Caldwell frequently referred to the police department as his "private army", "body guards," and "his" police department.

s. During the last state audit of Pine Lawn finances, it declared Mayor Caldwell's city vehicle use excessive in its public release. The Mayor then obtained the use of three city vehicles, alternating them out daily to not place too many miles on any one vehicle. Mayor Caldwell declined to have the county GPS new radio system placed in his city vehicles, as required. The radios allocated to his vehicles from the county were placed and installed in non-operable retired police junk cars, costing tax payers thousands of dollars.

t. Blakeney interviewed and investigated City Administrator Krueger about using state training funds for Pine Lawn general revenue when those funds were not given to Pine Lawn for its General operations. The training funds were being used to replace funds missing from the general fund. The state gave Pine Lawn training funds that were designated for certified police training and supplies. Blakeney questioned City Administrator Krueger about the misuse of the funds for other purposes and the legality of those actions. Blakeney also reported this to the State authorities and was seeking state criminal charges.

u. Blakeney also informed the F.B.I. regarding numerous retaliation actions harassment and intimidation after Pine Lawn learned about Blakeney's actions as a witness of the corruption. One example of the retaliation was the picture of a rat placed on his commander's office door in the Pine Lawn Police station under a surveillance camera. City Administrator told Blakeney that the camera was inoperable.

v. Blakeney also supplied the F.B.I. with a copy of a video and witness statements evidencing officers ignoring and violating the civil rights of a prisoner. Blakeney requested that the officers be terminated and investigated for possible criminal charges. After learning of Blakeney's investigation results, Director Gray agreed with Blakeney and requested that the officers be terminated. Mayor Caldwell and City Attorney Smith refused to fire them even though their actions were egregious and illegal. Smith blocked their termination packets from being presented to the Board of Aldermen.

**Blakeney's reports of theft by the City Administrator, Brian Krueger.**

Page **10** of 247

29.     Blakeney discovered that City Administrator Krueger may have been misusing Pine Lawn resources for his personal use.

30.     In fact, Blakeney began an investigation into misappropriation of significant funds from the Pine Lawn budget.

31.     The prior assistant to City Administrator Krueger, Valerie Jenkins, discussed her suspicions of Krueger's fraud with Blakeney.

32.     Blakeney began questioning City Administrator Krueger and others about the unauthorized transfer of funds and Krueger's separate bank account.

33.     Blakeney discovered that Krueger had an unapproved City bank account that had City funds deposited into the account.

34.     On or about October 20, 2014, Krueger utilized approximately $9,000 out of a $15,000 State of Missouri training fund check to pay for an Auto Tire mechanic bill because general funds were lacking.

35.     The ear-marked funds were to be used for civil disobedience training and supplies during the Ferguson protests.

36.     Blakeney advised Pine Lawn officials that he believed the actions to be criminal and that the money should be returned.

37.     Blakeney informed Director Gray about the misappropriation of City funds. Blakeney contacted the State authorities, and then met with the Prosecuting Attorney's office executive assistant and advised them of the incident.

38.     Blakeney also informed the F.B.I. of this activity.

39.     Mayor Caldwell, City Administrator Krueger, Blakeney's supervisor, Director Gray, and Attorney Smith were aware of Blakeney's reports to the state and F.B.I. of suspected illegal activities.

40.     An investigation was commenced, and Krueger was informed of Blakeney's allegations. The information provided by Blakeney is likely what eventually led to the termination and arrest of City Administrator Krueger, for misappropriating City funds through a fraudulent bank account.

41.     It was subsequently discovered by an auditor that approximately $400,000 was misappropriated, according to news and audit reports.

**Blakeney's reports of gross overbilling by City attorney, Donnell Smith.**

42.     Blakeney discovered that City Attorney Donnell Smith ("Smith") was submitting bills that amounted to gross overbilling.

43.     Smith's bills to Pine Lawn were three to four times more than nearby municipalities, which were significantly larger than Pine Lawn. The bills were also much larger than the other larger municipalities that had Smith as their City Attorney. Smith was the personal attorney for Mayor Caldwell in 2009 and settled a racial discrimination claim wherein Caldwell alleged that he was wrongfully fired from his prior job at Dillard's because of his race. The potential conflict of interest was not disclosed to the board of aldermen. Smith also represented Mayor Caldwell in other legal matters.

44.     Blakeney reported the overbilling to Mayor Caldwell and the Board of Aldermen. Blakeney discussed this issue at a meeting of the Board of Aldermen, with City Attorney Smith present. The Board immediately went into closed session to further discuss the issue.